**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:23-cr-20153-KMM-3

UNITED STATES OF AMERICA,

v.

OTHONIEL GOMEZ,

      Defendant.

_____/

**ORDER ON REPORT AND RECOMMENDATION**

THIS CAUSE came before the Court upon Defendant Othoniel Gomez's ("Defendant") Motion for New Trial Based Upon an Intentional Violation of the Jencks Act and *Brady* and Motion to Compel. ("Mot.") (ECF No. 189). The Court referred the Motion to the Honorable Lauren F. Louis, United States Magistrate Judge, for Report and Recommendation who held a hearing on the Motion on May 2, 2024. *See* (ECF Nos. 190, 216). On October 11, 2024, Magistrate Judge Louis issued a Report and Recommendation ("R&R") recommending that the Motion be denied. (ECF No. 246). Defendant filed timely objections. ("Obj.") (ECF No. 249). This Court held a status conference on November 21, 2024, and ordered the Government to respond to Defendant's objections. Thereafter, the Government filed its response, ("Resp.") (ECF No. 251), and the Defendant filed his reply. ("Reply") (ECF No. 252). The matter is now ripe for review. As set forth below, the Court ADOPTS IN PART and REJECTS IN PART the R&R.

**I.      BACKGROUND**

On June 14, 2023, a Grand Jury returned a Superseding Indictment against Defendant and several co-conspirators. *See generally* ("Indictment") (ECF No. 1). Defendant was charged in Count 1 with conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h); and

in Counts 11–15 with money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B). *Id.* at 1–2, 4–5. After a four-day trial, the jury convicted Defendant of Counts 11–14 and acquitted Defendant of Counts 1 and 15. (ECF No. 127). "In broad strokes, this case arises from an IRS operation to catch would-be money launderers." R&R at 2. Before the Defendant's involvement, Co-Defendant Jesus Javier Diaz ("Diaz") was approached by a confidential informant ("CI") who offered him the opportunity to launder money for a drug trafficking cartel." *Id.* Diaz coordinated a series of recorded meetings between the confidential informant and an undercover agent, Special Agent Marisa Sandoval ("Agent Sandoval"), and Defendant, along with others, were ultimately recruited by Diaz. *Id.* Diaz pled guilty and cooperated with the Government. *Id.* Defendant exercised his right to proceed to trial. *Id.* At trial, Defendant argued he was entrapped, and the jury was given an entrapment instruction. *See* (ECF No. 124) ("[I]f there is a reasonable doubt about whether the Defendant was willing to commit the crime without the persuasion of a Government officer or a person under the Government's direction, then you must find the Defendant not guilty."). After the jury deliberated for two days, with some indications of difficulty reaching a verdict, Defendant was acquitted on Counts 1 and 15 and convicted on Counts 11–14.[1] (ECF No. 127); *see also* (ECF No. 126 at 3 ("We can't come to a consensus on count 13, 14, and 15.")); *id.* at 6 ("After vigorous and thorough debate, we are unable to reach a unanimous decision.")).

On February 9, 2024, this Court denied Defendant's Motion for Acquittal or, in the alternative, Motion for New Trial. *See* (ECF No. 149). In preparing for Defendant's sentencing, Defense counsel realized that although the Government had provided, as early Jencks material,

---

[1] The additional counts in the Superseding Indictment pertained solely to Co-Defendants in this case. Count 1 was conspiracy to engage in money laundering and Counts 11–15 were substantive money laundering charges.

text messages between the CI, the UC, and the co-defendants, it had not turned over any communications between IRS Special Agent Robert Munoz ("Agent Munoz") and Agent Sandoval.  On February 16, 2024, despite providing assurances that it disclosed all Jencks material, the Government provided an "incomplete set of text messages (approximately 80 pages worth of conversations) between Agent Sandoval and Agent Munoz."[2]  Mot. at 5.  On March 19, 2024, "the Government produced a copy of the complete messages between Agent Munoz and Agent Sandoval [from] Agent Munoz' phone (232 pages worth of conversations between the lead agent and Agent Sandoval)."  *Id.*  In providing these records, the Government informed Defendant, for the first time, that Agent Sandoval deleted the messages between herself and fellow agents for "security reasons."  *Id.*  Consequently, no communications were disclosed between Agent Sandoval and other agents, absent those retrieved from Agent Munoz's phone.  *Id.*  Defendant contends that the messages, considered collectively, support his version of events, and connect Agent Sandoval, who was presented at trial as an unbiased actor, to the government's alleged plan to induce Defendant.  *See* Mot. at 24.  In addition, one of the messages disclosed post-trial included a conversation between Agent Munoz and Agent Sandoval where Agent Sandoval sent the following message to Agent Munoz "I would say we can pretend like we used someone else and then circle back in a couple weeks" followed by a second message "To get Otho numbers up[.]" (ECF 218–1 at 191).

On May 2, 2024, Magistrate Judge Louis held an evidentiary hearing where Defendant

---

[2] Defendant's Motion references an email conversation between Defense Counsel and the Government, where AUSA Dodin stated: "I collected the Jencks the agents provided to me prior to trial and actually provided it to you well in advance of their testimony. I asked them all to send me everything and then sent that over to you both. This appears to have slipped through the cracks by the agents – because I was not provided this prior to trial and did not have it until you asked me to get it. Obviously, you're entitled to Jencks without a request, but clearly this was on oversight on their part."  Mot. at 4.

called three witnesses: the prosecuting attorney, Assistant United States Attorney Yara Dodin ("AUSA Dodin"), Agent Sandoval, and Agent Munoz (Agent Sandoval and Agent Munoz, collectively as the "Agents"). R&R at 11. The R&R found that the "the text messages Sandoval sent to case agent Munoz in the course of the investigation are 'statements' within the meaning of the Jencks Act." R&R at 15 (citations omitted). The R&R also concluded that the "the Government's failure to disclose the message in violation of Jencks resulted here in harmless error."[3] *Id.* at 25.

## II.   LEGAL STANDARD

The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). The Court "must consider *de novo* any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3). A *de novo* review is therefore required if a party files "a proper, specific objection" to a factual finding contained in the report. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006). "It is critical that the objection be sufficiently specific and not a general objection to the report" to warrant *de novo* review. *Id.*

A party's objections are improper, however, if they expand upon and reframe arguments already made and considered by the magistrate judge, or simply disagree with the magistrate judge's conclusions. *See Melillo v. United States*, No. 17-CV-80489, 2018 WL 4258355, at *1 (S.D. Fla. Sept. 6, 2018); *see also Marlite, Inc. v. Eckenrod*, No. 10-23641-CIV, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 21, 2012) ("It is improper for an objecting party to . . . submit [ ]

---

[3] While the R&R also rejected Defendant's Motion for New Trial under *Brady*, this Court declines to adopt or reject those portions of the R&R, as it finds a new trial warranted for nondisclosure pursuant to the Jencks Act. *See* R&R at 14–15; *see also Hagans v. Lavine*, 415 U.S. 528, 549 (1974) (discussing the preference to resolve cases on non-constitutional grounds when feasible).

papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge.  Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R.") (quoting *Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)).  When the objecting party has not properly objected to the magistrate judge's findings, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *See Keaton v. United States*, No. 14-21230-CIV, 2015 WL 12780912, at *1 (S.D. Fla. May 4, 2015); *see also Lopez v. Berryhill*, No. 17-CV-24263, 2019 WL 2254704, at *2 (S.D. Fla. Feb. 26, 2019) (stating that a district judge "evaluate[s] portions of the R & R not objected to under a clearly erroneous standard of review" (citing *Davis v. Apfel*, 93 F. Supp. 2d 1313, 1317 (M.D. Fla. 2000))).

With respect to a magistrate judge's credibility findings, "a district court may not override essential, demeanor-intensive fact finding by a magistrate judge without hearing the evidence itself or citing an exceptional justification for discarding the magistrate judge's findings."  *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1250 (11th Cir. 2007).  "Rejecting credibility findings made by a magistrate judge without holding a new hearing is permissible only when there is an 'articulable basis for rejecting the magistrate's original resolution of credibility.'"  *Id.* (citing *United States v. Marshall*, 609 F.2d 152, 155 (5th Cir. 1980)).

## III.   DISCUSSION

In the R&R, Magistrate Judge Louis recommends that (1) the Court find that the undisclosed conversations were "statements" mandating disclosure under the Jencks Act, and (2) that the Court deny Defendant's Motion for New Trial on the grounds that the Government's failure to disclose the message in violation of Jencks resulted in harmless error.  Defendant

objected to the finding that the nondisclosure resulted in harmless error on several grounds including the R&R's application of the "harmless error standard," the distinction drawn between exculpatory and impeachment evidence in the R&R, and the R&R's determination that the suppressed statements did not contradict Agent Sandoval's testimony. *See generally* Obj.

A.      **The Undisclosed Conversations Were "Statements" Mandating Disclosure Under The Jencks Act**

Neither the Government nor Defendant objected to Magistrate Judge Louis's determination that the undisclosed conversations between the Agents were "statements" mandating disclosure under the Jencks Act.  R&R at 15.  AUSA Dodin was subpoenaed to testify at the evidentiary hearing on May 2, 2024, before Magistrate Judge Louis.  (ECF No. 212–1).  The subpoena required AUSA Dodin to "[p]roduce all requests for Jencks material that you made of the witnesses in [this case], including but not limited to emails, text messages, and any other format in which said requests are memorialized."  *Id.*  At the hearing AUSA Dodin gave the following testimony:

> Q. First of all, you received a subpoena in connection with this hearing, correct?
> A. Yes.
> Q. The subpoena requested that you bring with you any requests that you made of any of the agent in this case for Jencks material. You saw that in the subpoena?
> A. I actually didn't see that. No.
> Q. The subpoena requested the following, produce all requests for Jencks material that you made of the witnesses in [this case] included but not limited to e-mails, text messages and any other format in which said requests are memorialized. Do you recall that request?
> A. No. I don't.
> Q. Did you review the subpoena?
> A. I didn't review the attachment to the subpoena. No. I just assumed it was a subpoena for my testimony.
> Q. Do those types of records exist?
> A. May be e-mails. I'm not sure. I would have to review. A lot of our conversations regarding Jencks were in person or over the phone. So, I couldn't tell you if they do or don't.

To date, this Court has not received any information or documents from AUSA Dodin regarding the existence or non-existence of those records.   At the hearing AUSA Dodin

subsequently testified:

> Q. And in preparation for trial, how did you go about requesting the agent's Jencks material, did you ask each of the witnesses that were going to testify for their Jencks material?
> A. I can't remember that I asked each of the witnesses. I know that I spoke with Agent Munoz who was the lead case agent at the time, as well as Austin Mayberry who was the current case agent asking them to collect the Jencks material, and I also spoke with Agent Sandoval in preparation for trial for the messages that were still in her phone.

"A statement is 'in the possession of the United States' for Jencks Act purposes if it is in the possession of a federal prosecutorial agency." *United States v. Naranjo*, 634 F.3d 1198, 1211–12 (11th Cir. 2011) (quoting *United States v. Cagnina*, 697 F.2d 915, 922 (11th Cir.1983) (noting possession under the Jencks Act does not extend to materials in a state court's possession)).  Before trial began, the Government "assured the defense, numerous times, that all the Jencks material had been provided."  Mot. at 3.  In reliance of the Government's assurances, Defendant reasonably did not request production of the Jencks material.  *Id.* (quoting *United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir. 1985) ("When the government agrees to early disclosure, it obviates the need for a Jencks motion by the defendant at the close of each witness's testimony. However, such an agreement does not lessen the government's obligation to produce all material covered by Jencks.").  The Eleventh Circuit has considered evidence "in possession of Government" to include "both investigative and prosecutorial personnel."  *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) (citing *United States v. Antone*, 603 F.2d 566, 569 (5th Cir.1979)) (defining "in the possession of the Government" under *Brady*); *see also Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (quoting *Antone*, 603 F.2d at 570) ("This court's predecessor, the Fifth Circuit, held that there was no per se rule to determine whether information possessed by one government entity should be imputed to another, but rather, required 'a case-by-case analysis of the extent of interaction and cooperation between the two governments.'")

While at the time of the trial it is undoubted that the statements were "in the possession" of Agent Munoz, it is debatable whether the statements were in the "in possession of the United States" for Jencks Act purposes. *Compare id.*, with *United States v. Trevino*, 556 F.2d 1265, 1271 (5th Cir. 1977) ("In sum, a 'statement . . . in the possession of the United States" can only be read to mean a statement in the hands of the federal prosecutor'"). Nevertheless, as a "spokesman for the Government," the prosecutor's office is expected to ensure and preserve the rights of the accused by complying with constitutional and statutory disclosure requirements. *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government.."); *see also United States v. Beasley*, 576 F.2d 626, 632 (5th Cir. 1978) (citations omitted) ("The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies[.]") (discussing disclosure requirements under the Jencks Act). Accordingly, this Court finds no clear error with Magistrate Judge Louis's finding that there was a Jencks Act violation. R&R at 11. Accordingly, this Court ADOPTS the R&R's conclusion that the suppressed messages fell within the disclosure requirements of the Jencks Act.

**B.    The Government's failure to disclose the messages in violation of the Jencks Act did not result in harmless error.**

Upon the finding that the statements were suppressed in violation of the Jencks Act, this Court now considers whether the error was harmless. While the Defendant agrees with the R&R's determination that the messages fell within the scope of the Jencks Act, Defendant objects to the R&R's finding that the undisclosed Jencks material was not inconsistent or contradictory to Agent Sandoval's testimony at trial. Obj. at 1 (quoting R&R at 27 ("Ultimately the failure to produce

8

the statements violated the Jenks Act but did not controvert any evidence adduced at trial and thus had no substantial influence on the outcome.")).[4]  Defendant, pointing to *Goldberg v. United States*, argues that "[b]ecause courts cannot speculate whether the Jencks material could have been effectively utilized at trial, the harmless error doctrine must be strictly applied on Jencks Act cases."  Obj. at 3 (citing *Goldberg v. United States*, 425 U.S. 94, 112 n. 21 (1975)).  In addition, Defendant argues a new trial for failure to produce Jencks material is warranted *unless* a decision of harmful error would be clearly erroneous.  Obj. at 4.  Accordingly, this Court reviews the R&R's legal standard and conclusion that the suppressed statements merely amounted to harmless error *de novo*.  *See Macort*, 208 F. App'x at 784 (11th Cir. 2006).

**A. The Harmless Error Doctrine**

This Court first addresses the R&R's analysis regarding whether the Jencks material had "a substantial influence in the outcome," of the trial.  The appropriate consideration is not whether the Jencks material had a "substantial influence in the outcome," but rather, that a new trial should be ordered unless the error was harmless beyond reasonable doubt.  *United States v. Beasley*, 576 F.2d 626, 627 (5th Cir. 1978) ("Because, however, we find that the failure to produce was harmless beyond reasonable doubt with respect to the tax evasion conviction, we affirm that conviction."); *United States v. Rivera Pedin*, 861 F.2d 1522, 1530 (11th Cir. 1988) (quoting *Bagley*, 473 U.S. at 680) ("We are simply unconvinced that the prosecutor's failure to disclose Ream's false testimony was 'harmless beyond a reasonable doubt.'").  While this Court acknowledges the R&R's thorough review of the facts, the R&R erred in concluding that "Defendant has not carried his burden of showing how non-disclosure of this message would have had a 'substantial influence' on the

---

[4] While Defendant raised additional objections to the R&R, this Court need not address all objections, as this Court finds sufficient justification to order a new trial based on Defendant's objections discussed below.

jury[,]" because the R&R applied the incorrect legal standard.  R&R at 23 (citing *Beasley*, 576 F.2d at 629).

The Court in *Beasley* did not impose a "substantial influence" test, rather, the Fifth Circuit, distinguished Jencks Act violations from *Brady* violations by noting that the "substantial influence" test is appropriate "except perhaps where the departure is from a constitutional norm or a specific command of Congress[.]"  *Beasley*, 576 F.2d at 629 (citing *Kotteakos v. United States*, 328 U.S. at 764-765 (1946)).  The Fifth Circuit in *Beasley* ultimately determined:

> Whether or not non-disclosure violates due process, however, a new trial may still be the appropriate sanction for statutory non-compliance. The Jencks Act's blanket disclosure requirement, as we have already noted, reaches more broadly than the constitutional standard applicable to evidence "material to exculpation or impeachment." *United States v. Hildebrand*, 5 Cir. 1975, 506 F.2d 406, 409. Though the government may not be negligent here, the Jencks Act requires the adoption of prophylactic procedures to guarantee, to the fullest degree reasonably possible, comprehensive disclosure of material covered by that act. "The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies."

576 F. 2d at 631–32 (citations omitted) (cleaned up).  Consequently, disclosure under the Jencks Act imposes a heightened burden on the government than constitutionally mandated.  *Beasley*, 576 F.2d at 630 ("While the Jencks Act is also designed to facilitate fair trials, it is a statutory command that may, at the will of Congress, exact more than the constitutional minimum, and its blanket disclosure requirement supports the conclusion that courts are not to review materiality, but only potential usefulness to the defense.").  *Brady*, in contrast, is a rule of "fairness and minimum prosecutorial obligation" which creates a higher burden for post-conviction relief, compared to Jencks Act violations where the harmless error doctrine must be strictly applied.  *See Beasley*, 576 F.2d at 629–630 (citing *Goldberg*, 425 U.S. at 111 fn. 21).

**B.   The Prejudicial Effect Of The Suppressed Statements**

Having established the proper legal standard, the Court now addresses whether the suppressed statements resulted in harmless error. While the R&R thoroughly analyzes the prejudicial effect of each suppressed statement independently, our inquiry cannot stop there. As Defendant noted in his objections, and this Court ordered the Government to address at the status conference, the prejudicial effect of suppressed statements under the Jencks Act must be analyzed collectively. *See Kyles v. Whitley*, 514 U.S. 419, 420 (1995) (citations omitted) ("the state's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence considered item by item."). Consequently, even where a suppressed statement alone would constitute harmless error, the collective impact of all suppressed statements analyzed together may have had a prejudicial effect. *See Bagley*, 473 U.S. at 683 ("The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances"). Here, the Government concedes that the collective violations must be assessed cumulatively or "in light of the totality of the circumstances." Resp. at 10 (citing Obj. at 18). Accordingly, in determining whether the nondisclosure was harmless, this Court will analyze the impact of the suppressed statements collectively.

The Government argues that the breadth of evidence presented at trial demonstrates that the collective effect of the suppressed statements would render the nondisclosure harmless. *See* Resp. at 10. This argument, however, is misguided. *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) ("Much of the government's argument about the weight of the evidence against Alzate misses the mark, because it concerns proof that he knowingly possessed and imported cocaine. That is not where the line of contention was drawn at trial, and it is not where our materiality focus should be. The issue at trial, and the only issue, was Alzate's duress defense.") The Defendant never disputed that he participated in the transactions alleged. The sole issue raised

11

by the defense was whether the Defendant was entrapped.  *See* Reply at 10 ("By advancing an entrapment defense, Mr. Gomez essentially conceded to the fact that he laundered money.").  Thus, this Court need not weigh the suppressed evidence against the breadth of evidence presented at trial.  *See Mathews v. United States*, 485 U.S. 58, 63 ("[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct.").  Rather, this Court must consider whether the suppressed statements would have provided an opportunity to impeach, diminish the credibility, or create new lines of questioning during the cross-examinations of Agent Sandoval and Agent Munoz, which were unavailable to Defendant at trial.  Similarly, in determining whether granting a new trial is appropriate, this Court need not determine how the withheld evidence would alter the Defendant's trial strategy.  *Clancy v. United States*, 365 U.S. 312, 316 (1961) ("Since the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively.")

While the Government states that "most of witness' testimony at trial related to the elements of money laundering and not entrapment," AUSA Dodin acknowledged at the evidentiary hearing, that evidence of entrapment is commonly found in communications between law enforcement officers and their agents.  *See* Resp. at 10.  Moreover, the Government cannot honestly dispute it was unaware that entrapment would be an issue at trial, because the Government brought a motion *in limine* to preclude Defendant from arguing entrapment "unless and until the defense is able to make a proffer or showing of what evidence it will advance to meet its threshold burden."  (ECF No. 90 at 9).  Despite this acknowledgment, the Government still failed to provide Defendant any communications between agents in email, text, or otherwise before or during trial.  Consequently, the Government's argument that the witness's testimony was unrelated to

entrapment, after failing to provide Defendant with statements to aid in undermining the credibility of Agents Sandoval and Munoz, is unconvincing.  *See* Resp. at 10–11 (arguing evidence presented at trial "decimated any possibility of an entrapment defense").

Furthermore, in addressing whether the suppressed statements hindered Defendant's ability to cross-examine the Agents on entrapment, the Government notes that "the passage of time between the defendant's interactions with the CI" and his "eagerness to participate in these crimes to make money directly speak against any entrapment defense."  Resp. at 10.  Defendant notes, however, that on August 10, 2022, after being instructed not to initiate contact with the Defendant, the CI and Diaz have the following conversation (submitted into evidence at trial):

> CI:      "Uh, hey, not a fucking thing on that Otto guy, right?"
> Diaz:  "Nothing, bro."
> CI:      "Okay, bro. Okay Send me the Argentenian's name to find out. Because you know, at least if we could, you know, talk to him or…at least you or something, so we could maybe do business with him and all that. Because you know, since we spoke… because we talked too much to [Agent Sandoval] regarding that. So, you know, now I'm going to talk to her and she's going to ask me this shit. So… you know. Otto was not a go. He talked a lot too and nothing happened."

(ECF No. 249–1 at 14).  At the time of this conversation, Agent Sandoval was still undercover, posing as a high-ranking member of the drug cartel.  On August 12, 2022, the suppressed statements show Agent Munoz messaged Agent Sandoval "If you can, please text the CI the message we discussed earlier if you can," to which Agent Sandoval replies "Okay 👍 done[.]" (ECF No. 18–1 at 0011).  Defendant argues that after a long period of pressuring the Defendant through Diaz, the CI suddenly stops mentioning the Defendant and pressuring him to participate. (ECF No. 249–1 at 14).  Three days later, on August 15, 2022, after Agent Sandoval initiated contact with Diaz, Diaz sends the following message: "forgot to mention if any of [your] clients want to invest in commercial real estate here in Miami let me know I can get off market properties[.]"  *Id.*  The suppressed messages show that a screenshot of this conversation was sent

13

to Agent Munoz on August 15, 2022, who replied on August 16, 2022, with "I know you have a meet today and tomorrow. Do you [have] time for us to set something up this week? Please give me a call back when you have a minute to talk[.]" *Id.* at 0013. Over four hours later Agent Sandoval says to Agent Munoz "I say let's just move forward with your thing sometime in the late morning. Other one is still not confirmed[.]" *Id.* Neither this Court nor Defendant have received phone records to determine whether a phone call occurred. The next day Agent Sandoval had a meeting with Diaz where, according to Defendant, for the first time after months of rejecting real estate transactions, Agent Sandoval indicates her interest in real estate to induce Defendant. At that meeting the following conversation, which was submitted into evidence at trial, was recorded between Agent Sandoval and Diaz:

> Sandoval: And that's why I came here to ask you, who else? Or, what other ways?
> [Unintelligible] that has helped me [Unintelligible]
> Diaz:   Right. No, like I said, I had a really good guy.
> Sandoval: Yeah.
> Diaz:   Pero, he didn't like Efrain.
> Sandoval: Yeah [Laughing].

(ECF No. 217–13 at 13). Agent Sandoval and Diaz then discuss why Agent Sandoval, acting undercover, is hesitant to give more work to Yuniel even though "he has the right set up[,]" and then says, "I'm interested if you have anybody else[.]" *Id.* at 14. Diaz then says "At this moment, the people that I have it's not worth it." *Id.* After some back and forth regarding whether Diaz has individuals that can "help" Agent Sandoval, the following conversation was recorded, which was admitted into evidence during trial:

> Diaz:   But if you're looking for a company to wire…
> Sandoval: Yeah, I mean, that's the one thing I do need because the client has money. He wants to start investing here. [Unintelligible]. He's interested in buying here too.
> Diaz:   Okay.
> Sandoval: Um, as soon as I have anything more concrete, I'll tell you.
> Diaz:   Okay.
> Sandoval: Like he wants to start investing some other [UI] from here.

> Diaz:   Okay. If he [Unintelligible] I can call the same guys that I spoke [Unintelligible],
> that didn't like Efrain.
> Sandoval: Uh huh.
> Diaz:   [Unintelligible].
> Sandoval: Oh, that's good.
> Diaz:   He deals with the closing companies. Real estate companies and he has his own
> closing realty company.
>  Sandoval: Now, would he… would he be… willing to take cash to do real estate
> transactions?
> Diaz:   He was. He was. Like I mentioned, he was, but he didn't like Efrain.
> Sandoval: Um…
> Diaz: So…
> Sandoval: … I wonder why? What did he tell you?
> Diaz: He told me that is the way that he approached him. I don't know. I don't know. He
> just didn't like him.
> Sandoval: Really?
> Diaz: Yeah. You know, at the beginning everything was good and then, I guess
> something came up or Efrain said something he didn't know like. I don't know. I don't
> know. He just told me that he didn't like him.
> Sandoval: But he knows about the business?
> Diaz: Yes, I explained it to him. I explained the business to him.
> Sandoval: So he won't [Unintelligible].

*Id.* at  23.  Later in the conversation Diaz informs Agent Sandoval that Defendant backed out of

the previous transaction, but that Diaz will try to convince him because "we really need more

people that can move." *Id.* at 27.  Agent Sandoval seemingly approves of this idea.  *Id.*

Defendant argues in his Motion, that the suppressed statements, i.e., the conversations

between Agent Sandoval and Agent Munoz, provide impeachment and credibility evidence that

could have been used during the cross-examination of Agent Sandoval to support his theory that,

contrary to Agent Sandoval's testimony, she knew the Defendant's identity prior to October 19,

2022.  Mot. at 25 ("the suppressed material provides an extensive amount of impeachment

evidence for both Agent Sandoval and Agent Munoz.  It supports the fact that when the CI's efforts

to induce Mr. Gomez through Mr. Diaz were not working, the lead agent and the undercover

developed a plan to induce Mr. Gomez").  At trial, Agent Sandoval gave the following testimony:

Q. When you met the defendant on October 19th of 2022, had you ever met him before?

A. I had not.
Q. Did you know who he was?
A. No, I did not.
Q. Did you know his name?
A. No.
Q. Did you know anything about him?
A. No.

(ECF No. 177 at 6–7).  The importance of this testimony was further illustrated in the

Governments closing:

> There is no entrapment when a defendant is willing to break the law and the government merely provides what appears to be a favorable opportunity for the defendant to commit a crime. So, what happened here? You want to make money? He showed up to the meeting, and remember, the informant didn't know who he was on October 19, 2022. I know they are going to get up here and tell you that is hard to believe. It is really not. She told you, she basically goes from state to state, as an undercover agent in different cases. She is not a part of the investigative team. She is someone that they use in the investigation.

While it is possible that the timeline of events was a mere coincidence, this Court cannot conclude,

beyond a reasonable doubt, that the Defendant was not prejudiced by the nondisclosure.  Put

simply, the Defendant has a right to cross-examine Agent Sandoval with the suppressed

statements, regarding her testimony that she was unaware of Defendant's identity prior to October

19, 2022.

Similarly, the Government's argument that Agent Sandoval's opinions are irrelevant and

inadmissible are incorrect.  Agent Sandoval's beliefs and intentions during the investigation would

aid a jury in determining whether Defendant was entrapped.  The Government specifically argues:

> Whether or not Agent Sandoval believed the defendant was hesitating (or what reasons he would be hesitating for) is not the operative question here. What is more, defense counsel's questioning at trial, asking, "and so there is hesitation about him sending the wires, correct?" is speculative in and of itself because it requires Agent Sandoval to assume the defendant's thoughts and feelings, making it an inadmissible line of questioning anyway.

Resp. at 6.  Defendant's theory of the case is that he no longer intended to participate in the money

laundering scheme, but nevertheless, felt obligated to participate because he believed Agent Sandoval was a high-ranking drug cartel member who posed a threat to his safety. *See* Reply at 5 ("the newly discovered evidence undermines Agent Sandoval's testimony that she did not know (or believe) that Mr. Gomez was hesitating when he gave the made-up excuse of his father being in the hospital for his delay in laundering the money"). At trial Agent Sandoval gave the following testimony:

> Q. Now, defense counsel painted him throughout the trial as someone who is so scared and so timid, and is unwilling to do it, right?
> A. Correct.
> Q. Did you get that sense from him? Did you feel like on October 19th or January 11th, or in your car, that he didn't want to be there?
> A. No.
> Q. Did you get the sense that he was being forced to launder money, and then make a profit from laundering that money?
> A. No.

(ECF No. 56 at 12–23). The suppressed evidence shows that Agent Sandoval sent a screenshot from Diaz to Agent Munoz, where Diaz said Defendant could not deposit the money at first because the bank was closed, and then once the bank reopened, because the Defendant's father was in the hospital after a stroke. (ECF No. 218–1 at 181–191). According to Defendant, neither of these excuses were true, but rather, Defendant was avoiding depositing the money because he did not want to participate in the money laundering scheme. *See* Reply at 5. The suppressed statements reveal the following exchange:

> Sandoval: "Do you believe him?"
> Munoz: "No but we have little choice. I don't think he will not pay us. We will give him [until] Monday at the latest"
> Sandoval: "Okay"

(ECF No. 218 at 00105). Afterwards, Agent Sandoval sends Diaz the following message "I understand that things happen and I'm sorry of his dad, but I expect the wire no later than tomorrow. If someone tells me they are going to do something, I expect them to follow through."

*Id.* at 00106.  Diaz responds, "I agree[.]"  *Id.* at 00112.  The suppressed statements then show Agent Sandoval takes a screenshot of that exchange and sends it to Agent Munoz, to which he replies "👍" and in a separate message "Thank you[.]"  *Id.* at 00117.  This Court agrees that the suppressed evidence provides no additional insight into what the Defendant believes or intends, but the Government's argument fails to address its intended purpose—to illustrate Agent Sandoval's role in the purported entrapment.  Put simply, if Agent Sandoval believed Defendant did not want to follow through with the transaction, but still chose to pressure Defendant through Diaz, Defendant could use this as probative evidence of entrapment.

In addition, the Government later concedes that the suppressed statement between the Agents where, after Defendant declined to participate at least three times, Agent Sandoval messaged Agent Munoz "I would say we can pretend like we used someone else and then circle back in a couple weeks" and then in a separate message "[t]o get Otho numbers up" related to entrapment.  *See* ("Numbers Conversation") (ECF 218–1 at 191); *see also* Resp. at 3 ("Agent Sandoval was involved in the transactions the defendant participated in—namely, the $200,000 he laundered. Agent Sandoval, as an experienced IRS agent, also understands the concept of entrapment, for example. The more the transactions a person is involved with, the less likely they will be able to effectively posit an entrapment defense.").  As Defendant points out, this statement may be illustrative of Agent Sandoval's bias throughout the investigation and may undermine her testimony that she was disconnected from the investigation.  Mot. at 2 ("Agent Sandoval's testimony allowed the Government to argue that her meeting with [Defendant], was completely independent from the CI (she had no knowledge of [Defendant], including the fact that he was a real estate agent, his rejection of the scheme, or the CI's threats) and therefore, the Government could not have entrapped [Defendant] at this point.")); *see also* (ECF No. 177) (Agent Sandoval

testifying at trial) ("Well, it is because we are not in the business of making criminals. We are in the business of catching criminals.")

While the Government further argues Defendant was not "hesitating" and that the "more obvious concern" for Agent Sandoval was whether Defendant would disappear with "the [her] funds[,]" that distinction is for a jury. *See* Resp. at 5–7; *see also Brown v. Wainwright*, 785 F.2d 1457, 1466 (11th Cir.1986) (discussing the importance of the jury hearing additional evidence of bias). Because the Government thoroughly questioned Agent Sandoval on her intentions, motivations, and involvement throughout the investigation, the Defendant has a right to confront Agent Sandoval with the suppressed statements.

In discussing the Numbers Conversation, the R&R concludes that "[t]he withheld message relates only to impeachment of Sandoval as a witness, as distinguished from being direct, exculpatory evidence that supports Defendant's entrapment defense." R&R at 25 (citations omitted) (finding Jencks violation was harmless error). Under the Jencks Act, as opposed to constitutional disclosure requirements, the consideration is not whether the suppressed statements serve as "direct, exculpatory evidence;" rather, the consideration is whether the evidence relates to a government witness's testimony and could be used for impeachment purposes or introduces the possibility of a new line of questioning to the defendant. *See Goldberg*, 425 U.S. at 107 (citing *Campbell v. United States*, 365 U.S. 85, 92 (1961)). As the Supreme Court stated in *Campbell* the Jencks Act was enacted on the premise that a "defendant on trial in a federal criminal prosecution is entitled, for impeachment purposes, to relevant and competent statements of a government witness in possession of the Government touching the events or activities as to which the witness has testified at the trial." 365 U.S. at 92; *see also Clancy v. United States*, 365 U.S. 312, 316 (1961) (quoting *Jencks v. United States*, 353 U.S. 657, 667 (1957)) ("Flat contradiction between

19

the witness' testimony and the version of the events given in his report is not the only test of inconsistency. The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony.'") Moreover, while the R&R finds that the value of the Numbers Conversation is diminished because it occurred after the transactions alleged in the indictment, R&R at 16, this Court finds that the Numbers Conversation may have served as useful impeachment evidence while cross-examining Agent Sandoval.

Finally, since Defendant's trial, the Government has conceded that throughout Agent Sandoval's investigation, she deleted messages with her fellow agents in violation of IRS policy and procedure. R&R at 29. Accordingly, this Court finds that Defendant has a right to cross-examine Agent Sandoval on her training and failure to act in accordance with that training. Obj. at 17 (citing *Guzman*, 663 F.3d 1336 at 1348) ("Just as in *Guzman*, it would also be crucial for the factfinder to know that Agent Sandoval deleted her messages with Agent Munoz, and that there are missing messages between Agent Munoz and the CI during this same period.").

Because this Court finds that the suppressed statements prejudiced Defendant at trial for several reasons—impeachment, witness credibility, and the creation of new lines of questioning previously unavailable to Defendant—this Court cannot conclude that the error was harmless beyond a reasonable doubt.

## IV.    CONCLUSION

UPON CONSIDERATION of the Motion, the R&R, the Objections, the pertinent portions of the record, and being otherwise fully advised in the premises, the R&R (ECF No. 73) is hereby ADOPTED IN PART and REJECTED IN PART. Defendant's Motion for New Trial Based Upon an Intentional Violation of the Jencks Act and *Brady* (ECF No. 189) is GRANTED. The Court

will schedule a new trial under a separate Order.

DONE AND ORDERED in Chambers at Miami, Florida, this 17th day of December 2024.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record